### IN RE KELSEY M. ET AL.*
### (AC 30853)

Harper, Robinson and Pellegrino, Js.

---

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for

Argued January 7—officially released April 20, 2010

*Kathryn Steadman,* for the appellant (respondent mother).

*Susan T. Pearlman,* assistant attorney general, with whom, on the brief, was *Richard Blumenthal,* attorney general, for the appellee (petitioner).

*Michael Fryar,* for the minor children.

inspection only to persons having a proper interest therein and upon order of the Appellate Court.

PELLEGRINO, J. The respondent mother appeals[1] from the trial court's orders of temporary custody regarding her minor children, Kelsey and Cailey. On appeal, the respondent claims that the court improperly granted orders of temporary custody on the basis of a determination that the children were at imminent risk of physical harm. We disagree and, accordingly, affirm the judgments of the trial court.

The record reveals the following facts and procedural history. On February 2, 2009, during the evening, a crisis hotline received a call from a woman later determined to be the respondent. During the call, the respondent stated that she wanted to kill herself and others and asked the call specialist how she could kill herself. She reported having previously attempted suicide by starving herself, cutting herself and running her car into a truck. She also stated that she had a gun. Police confirmed that the children's father, the respondent's husband, had thirty-five guns registered to his name.

After the caller refused to give out any identifying information, the call specialist ran a trace on the telephone call and contacted the Manchester police, who dispatched officers to the home. Shortly thereafter, two officers arrived at the home and knocked on the front door. The police report stated that the call specialist, while still on the telephone with the respondent, heard the police knocking on the door through the open telephone line. The respondent did not answer the door. The call specialist also heard the respondent tell the children to hide when the police arrived and not to give her name to the police if they came in. After the police

---

[1] The respondent father of the two minor children at issue in this appeal also was named in the neglect petitions that commenced this case. Because he has not appealed, we refer in this opinion to the respondent mother as the respondent.

determined that they needed to enter the home, the local fire department was contacted and gained entry through a front window. Upon entering the home, police officers found the respondent alone with the children, who were upset and crying in a bathtub.

The respondent refused to answer any questions and denied that she was having suicidal thoughts, although she stated to officers that her brother, sister and father all had committed suicide. Thereafter she was transported by Manchester police to Manchester Memorial Hospital for an emergency examination. The children's father was called, and he came to the home. He stated to police that he had only two guns at that time and that both were kept in a safe. There was no evidence presented as to whether the respondent had access to the guns.

At the hospital, the respondent was examined by Drew Kronk, a licensed clinical social worker. The respondent refused to admit that anything was wrong and only eventually stated that she had had three beers and that she may have said something when she was upset. She also denied calling the crisis hotline or speaking to the counselor on the telephone. Later, she claimed that the police may have entered the house by mistake and reported that, in the past, bounty hunters had mistakenly come to her home looking for people. According to hospital records, a drug and alcohol screen was taken because the respondent "appeared to be intoxicated and was remarkably uncooperative. . . . She was agitated and not verbally directable . . . ." Because of the respondent's resistance to testing, her blood was drawn approximately six hours after she had arrived at the hospital. At that time, she still had a blood alcohol level of 0.068. A physical examination also revealed healing parallel abrasions on her forearm that appeared to be the result of self-inflicted cuts. According to Kronk, the respondent looked to her husband for direction in

answering questions and did not appear forthright in her responses.

While the respondent was hospitalized, the father insisted that the respondent's confinement was improper and threatened that he would file a complaint against the hospital. The father stated that the respondent was " 'being discriminated against,' " denied having any guns and was adamant that the entire situation was "a big mistake." At the February 25, 2009 show cause hearing on the motions for orders of temporary custody, Susan Parke, the psychiatrist who reviewed the case, testified in response to a hypothetical question by counsel for the petitioner that she would be concerned that the father, by denying the incident, refused to acknowledge the danger the respondent posed to herself and their children.

From the examination of the respondent, Kronk determined that she posed a risk to herself and others, and the respondent was admitted under a physician's emergency certificate as an involuntary patient. Kronk also contacted the department of children and families (department). On February 3, 2009, William Olsen, a department social work investigator, attempted to speak to the respondent and the father to conduct an assessment of the family. Both parents refused to talk to Olsen, and the father insisted that he had an attorney. Olsen was also denied the chance to assess the children because the parents refused to make them available for interviewing. Both children are on the autism spectrum and have special needs.

Olsen also learned that the department knew of the family due to the respondent's mental health issues, history of domestic violence and the father's controlling nature. The respondent was also well known to hospital personnel for previous threats of suicide, domestic abuse and drug overdoses. In the past, she has been

diagnosed with mood disorder, post-traumatic stress disorder and personality disorder. According to Parke, the respondent's personality disorder may cause her to be unduly impulsive, have abandonment issues, have difficulty regulating emotions and relating to her children and may pose a risk of self-harm. During previous hospitalizations, the respondent also reported physical abuse that often occurred in front of the children and that she was fearful of retribution from her husband if she revealed the abuse during therapy. The respondent has been hospitalized for severe depression and sleeping pill overdose but has consistently refused all attempts by the department to provide services.

On February 6, 2009, the petitioner filed neglect petitions and sought orders of temporary custody. On February 25, 2009, the court, *Olear, J.*, held a show cause hearing on the motions for orders of temporary custody. On March 3, 2009, the court issued a memorandum of decision granting the petitioner's motions for orders of temporary custody as to Kelsey and Cailey. The respondent appeals from that ruling.

We initially set forth the applicable law and our standard of review. Pursuant to General Statutes § 46b-129 (b), the court may issue "an order ex parte vesting in some suitable agency or person the child's or youth's temporary care and custody" if it appears, on the basis of the petition and supporting affidavits, that there is reasonable cause to believe that "(1) the child or youth is suffering from serious physical illness or serious physical injury or is in immediate physical danger from the child's or youth's surroundings, and (2) that as a result of said conditions, the child's or youth's safety is endangered and immediate removal from such surroundings is necessary to ensure the child's or youth's safety . . . ."

"At a subsequent hearing on an order of temporary custody, the proper standard of proof . . . is the normal civil standard of a fair preponderance of the evidence." (Internal quotation marks omitted.) *In re Kaurice B.*, 83 Conn. App. 519, 522, 850 A.2d 223 (2004). "We note that [a]ppellate review of a trial court's findings of fact is governed by the clearly erroneous standard of review. The trial court's findings are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . We cannot retry the facts or pass on the credibility of the witnesses. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) Id., 523. With those principles in mind, we will review the evidence presented at the hearing on the motions for orders of temporary custody to determine whether the court's determination is supported by the evidence in the record.

The respondent contends that the court had no basis in the evidence to find that the children were in imminent danger and that the court improperly applied the theory of predictive neglect. We disagree. Substantial evidence was presented regarding the circumstances in the respondent's home on February 2, 2009. The respondent was suicidal, made threats of hurting herself and others, and maintained that she was in possession of a gun. Most troubling, she was under the influence of alcohol and left alone to care for two children with special needs who, during this crisis, were put in a bathtub where they were found alone, yelling and crying. Further, the respondent had told the children to lie about her identity and, when help arrived, refused to answer the door, forcing fire department personnel

to enter through a window. The details of this incident, combined with the respondent's long history of mental health issues and suicidal tendencies, and the father's denial of the respondent's problems, were heard by the court at the hearing on February 25, 2009.

The respondent also contends that the court erred by relying on cases concerning the theory of predictive neglect. This claim is without merit. The court was not faced with the question of predictive neglect but, rather, whether the children faced imminent harm from their physical surroundings. The court based its decision on the record of the respondent's mental health problems, the events of February 2, 2009, and the father's denial of the gravity of the respondent's mental health issues. Accordingly, the court properly granted the orders of temporary custody.

On the basis of our independent review of the evidence presented at the hearing, we conclude that the court's decision to grant orders of temporary custody was amply supported by the record and, therefore, is not clearly erroneous.

The judgments are affirmed.

In this opinion the other judges concurred.