## IN RE PAUL O.*
### (AC 31770)

DiPentima, C. J., and Beach and Hennessy, Js.

---

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

Argued September 8—officially released November 23, 2010

*David B. Rozwaski,* for the appellant (respondent mother).

*Frank H. LaMonaca,* assistant attorney general, with whom, on the brief, were *Richard Blumenthal,* attorney general, and *Susan T. Pearlman,* assistant attorney general, for the appellee (petitioner).

*Ingrid Swanson,* for the minor child.

*Opinion*

HENNESSY, J. This is an appeal by the respondent mother[1] from the judgment of the trial court sustaining an order of temporary custody regarding her minor child, Paul. On appeal, the respondent claims that the judgment of the court is against the weight of the evidence. We disagree and, accordingly, affirm the judgment of the trial court.

The record reveals the following relevant facts and procedural history. The respondent gave birth to Paul on February 4, 2009. On September 3, 2009, the respondent brought Paul, who was then approximately seven

---

[1] The child's father is not a party to this appeal. We therefore refer in this opinion to the respondent mother as the respondent.

months old, to the Hill Health Center (center) in New Haven for a routine medical examination. The examination was conducted by Kathleen Stone, a pediatric nurse practitioner. As she entered the examination room, Stone observed that the respondent was sitting in a chair with her back turned toward Paul, whom the respondent had placed on an examination table. Stone immediately was concerned for Paul's safety because she believed that Paul could have been injured if he had rolled off the table while the respondent was not paying attention to him. Stone also was concerned because the respondent was unable to formulate coherent answers to Stone's questions about Paul's medical history.

As a result of her conversation with the respondent, Stone was left with the false impression that the department of children and families (department) already had opened a case and was investigating the respondent's fitness as a parent. Stone left several messages with the department in order to express her concern to the relevant caseworker. The department, however, did not respond to Stone's messages.[2]

On October 29, 2009, the respondent returned to the center with Paul for an appointment with Stephan Updegrove, a pediatrician. Updegrove, much like Stone, observed that the respondent was unable to provide coherent answers to his questions about Paul's medical history and often strayed from the subject of their conversation. At one point, the respondent stated that she had been incorrectly diagnosed as a schizophrenic when she was a child. Updegrove also observed that the respondent was wearing a bracelet that was covered with one inch long chrome spikes. Updegrove advised the respondent that the bracelet posed a danger to

---

[2] In fact, the department did not have an open case file, nor was it investigating the respondent's fitness as a parent at that time.

Paul's health after he observed Paul twist in the respondent's arms with his face coming close to the spikes on the bracelet. The respondent, however, chose not to remove her bracelet.

Stone ultimately established contact with the department on or about November 5, 2009, and informed it of her observations. Thereafter, the department assigned Matthew Bourquard to investigate Stone's concerns. Bourquard made an unannounced visit to the respondent's apartment on the afternoon of November 5, 2009. He first observed Paul sleeping on the respondent's bed. Bourquard advised the respondent that the department recommended against sleeping with a nine month old child due to the risk that a parent could roll over while asleep and injure her child. He also advised the respondent that the department recommended against allowing a child of Paul's age to sleep in a bed due to an increased risk of sudden infant death syndrome. The respondent, however, did not show any concern regarding Paul's sleeping arrangements.

As he proceeded farther into the respondent's home, Bourquard observed that dirty clothing, garbage and various other debris were scattered throughout the apartment. He advised the respondent that her apartment was unsanitary and unsafe for a child of Paul's age. The respondent, however, claimed that she had been busy and had not had time to clean her apartment for several days.

The petitioner, the commissioner of children and families, decided, on the basis of Bourquard's observations, to place Paul on a ninety-six hour hold.[3] Although the

---

[3] General Statutes § 17a-101g provides in relevant part that "(e) [i]f the Commissioner of Children and Families, or the commissioner's designee, has probable cause to believe that [a] child . . . is in imminent risk of physical harm from the child's surroundings and that immediate removal from such surroundings is necessary to ensure the child's safety, the commissioner, or the commissioner's designee, shall authorize any employee of the department or any law enforcement officer to remove the child . . . from

respondent visibly was upset when she was informed of the petitioner's decision, she assisted Bourquard in placing Paul into a car seat. Bourquard then noticed that Paul's left foot was badly bruised. When Bourquard inquired as to the cause of Paul's injury, the respondent explained that a plate had fallen onto Paul's foot several days earlier. The respondent also informed Bourquard that while she had not sought professional medical treatment for Paul's injury, she had attempted to treat the injury herself by bathing Paul's foot in a bathtub. Bourquard subsequently brought Paul to the emergency room at Yale-New Haven Hospital where it was determined that Paul's foot was bruised but not more seriously injured. The petitioner then placed Paul into foster care.

On November 9, 2009, the petitioner filed a neglect petition and an ex parte motion for an order of temporary custody. Later that day, the trial court granted the petitioner's motion for temporary custody and committed Paul to the custody of the petitioner, finding that there was reasonable cause to believe that Paul was in imminent risk of physical harm from his surroundings and that Paul's immediate removal from those surroundings was necessary to ensure his safety.

On November 10, 2009, Bourquard returned to the respondent's apartment to arrange for a supervised parent-child visit. While he was inside the respondent's apartment, Bourquard noticed that the respondent had removed some of the clothing and debris that had been present during his initial visit on November 5, 2009. Bourquard, however, was unable to examine the entire apartment as the respondent was unwilling to allow him to proceed beyond the front room. Bourquard also recommended that the respondent enroll in Yale University's intensive safety planning program, which is

such surroundings without the consent of the child's parent or guardian. . . .

"(f) The removal . . . shall not exceed ninety-six hours. . . ."

designed to accelerate parent-child reunification by addressing issues that lead to the removal of children from the home. The respondent, however, was not willing to participate in the program.

In the middle of November, the department assigned Adina Ghanooni to the case as the ongoing treatment social worker. Ghanooni went to the respondent's apartment in early December to schedule a supervised parent-child visit. While she was in the respondent's apartment, Ghanooni observed that it was quite clean. The respondent, however, was reluctant to speak to Ghanooni without her attorney being present. The respondent subsequently contacted Ghanooni via telephone and agreed to attend a supervised parent-child visit on December 9, 2009. During the visit, Ghanooni observed the respondent attempt to give a glass ring to Paul as a gift. The ring was approximately the size of a quarter, and Ghanooni believed that the ring presented a choking hazard to Paul, who was then approximately ten months old. Paul never received the ring.

On November 13, 2009, the court held a preliminary hearing on the order of temporary custody and scheduled a trial for November 20, 2009. During the trial, which occurred on November 20 and December 11, 2009, Stone, Updegrove, Bourquard and Ghanooni testified as to the foregoing facts. The respondent also offered her own testimony and provided the court with a history of her struggle with mental illness. Specifically, the respondent testified that although she had received psychiatric treatment throughout much of her life, she had been discharged and was no longer taking psychotropic medication.

At the conclusion of the hearing on December 11, 2009, the court sustained the order of temporary custody. The court based its decision on its finding that Paul would continue to be in imminent risk of physical

harm if he was returned to the respondent's custody. This appeal followed.

We begin by setting forth the applicable law and standard of review. Pursuant to General Statutes § 46b-129 (b), the trial court may "issue an order ex parte vesting in some suitable agency or person the child's or youth's temporary care and custody" if it appears, "from the specific allegations of the petition and other verified affirmations of fact accompanying the petition and application, or subsequent thereto, that there is reasonable cause to believe that (1) the child or youth is suffering from serious physical illness or serious physical injury or is in immediate physical danger from the child's or youth's surroundings, and (2) that as a result of said conditions, the child's or youth's safety is endangered and immediate removal from such surroundings is necessary to ensure the child's or youth's safety . . . ."

The proper standard of proof in a trial on an order of temporary custody is "the normal civil standard of a fair preponderance of the evidence. . . . We note that [a]ppellate review of a trial court's findings of fact is governed by the clearly erroneous standard of review. The trial court's findings are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . We cannot retry the facts or pass on the credibility of the witnesses. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . With those principles in mind, we will review the evidence presented at the hearing on the [motion] for [an order] of temporary custody to determine whether the court's determination is supported by the evidence in the record." (Citations omitted; internal

quotation marks omitted.) *In re Kelsey M.,* 120 Conn. App. 537, 543, 992 A.2d 372 (2010).

The respondent contends that the trial court had no basis in the evidence to find that Paul would continue to be in immediate physical danger if he was returned to her custody. Specifically, the respondent contends that the evidence in the record demonstrates that the court's concern regarding the state of her apartment was unfounded, that her history of mental illness was irrelevant and that she exercised sound parental judgment. We are not persuaded.

The respondent first contends that the court's concern regarding the state of her apartment was unfounded. We disagree. The record contains substantial evidence regarding the woeful state of the respondent's apartment. Specifically, the record contains evidence that the apartment was littered with dirty clothing, garbage and various other debris on November 5, 2009. The respondent correctly asserts that two witnesses, Bourquard and Ghanooni, testified that she had subsequently cleaned at least a portion of her apartment. The court's finding that Paul would continue to be in immediate danger, however, is amply supported by the record.

The respondent also contends that her history of mental illness was irrelevant and that the record demonstrates that she exercised sound parental judgment in caring for Paul. We disagree. The court heard substantial evidence from the respondent herself that she had a long history of mental illness. Despite the respondent's argument to the contrary, her mental condition was relevant to the extent that it impacted on her ability to function as a parent. See *In re Nicolina T.,* 9 Conn. App. 598, 607, 520 A.2d 639 (in termination of parental rights trial, mental illness relevant to extent it affects ability to function as parent), cert. denied, 203 Conn.

804, 525 A.2d 519 (1987). The record also contains substantial evidence to support the court's concerns regarding the respondent's judgment. Specifically, the record contains evidence that the respondent left Paul, who was then seven months old, on an examination table that was outside of her field of vision. The record also contains evidence that the respondent refused to remove a bracelet covered with spikes that posed a risk to Paul's physical well-being, attempted to give Paul a small glass ring that presented a choking hazard and that the state of her apartment presented a hazard to Paul's health.

We conclude, on the basis of our review of the evidence presented to the trial court, that the court's decision to sustain the order of temporary custody was supported by the record.

The judgment is affirmed.

In this opinion the other judges concurred.