## IN RE SHAUN S. ET AL.*
## (AC 34143)

Beach, Bear and Sheldon, Js.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

Argued June 5—officially released July 17, 2012**

** July 17, 2012, the date that this opinion was released as a slip opinion, is the operative date for all substantive and procedural purposes.

*Lisa M. Vincent,* for the appellant (respondent mother).

*Gregory T. D'Auria,* solicitor general, with whom were *Susan T. Pearlman,* assistant attorney general, and, on the brief, *George Jepsen,* attorney general, for the appellee (petitioner).

*Opinion*

BEAR, J. The respondent mother, Candace D., appeals from the judgments of the trial court sustaining the December 7, 2011 ex parte orders granting temporary custody of her son, Shaun S., to his father, Richard O., and her daughter, Severina D.,[1] to the petitioner, the commissioner of children and families (commissioner).[2] On appeal, the respondent claims that the court erred because (1) the commissioner began drafting a neglect petition in October, 2011, and acknowledged

---

[1] We addressed the appeal of Severina D.'s father in the companion case of *In re Severina D.,* 137 Conn. App. 283, 48 A.3d 86 (2012), which was released on the same date as this opinion.

[2] What ultimately is at issue in any custody proceeding is the best interest of each child. See, e.g., General Statutes § 46b-56 (b). "[T]emporary custody orders are immediately appealable because an immediate appeal is the only reasonable method of ensuring that the important rights surrounding the parent-child relationship are adequately protected . . . and, further, that an immediate appeal is the only way to ensure the protection of the best interests of children." (Citation omitted; internal quotation marks omitted.) *In re Shamika F.,* 256 Conn. 383, 385, 773 A.2d 347 (2001).

that her children were not exposed to any change in circumstances in the interim; thus, the December 7, 2011 ex parte orders of temporary custody violated her procedural due process rights and should be revoked immediately; (2) even if the initial removal of the children was lawful, the trial court had a legal obligation to consider that a change in circumstances had occurred and that the removal of the children from the respondent was no longer necessary to protect them from imminent risk of harm; and (3) the department of children and families (department) violated the respondent's constitutional rights to privacy and to freedom of association when it used evidence of her childhood history of being abused to justify intrusion into her personal relationships with her children and with her mother, Christy D., the children's maternal grandmother (maternal grandmother). We affirm the judgments of the trial court.[3]

The court did not file a written memorandum of decision in this case, electing, instead, to issue an oral decision from the bench.[4] The record reveals the following facts and procedural history. The department, since 2007, has had involvement with the respondent and Shaun, who was born in 2006, after having received a referral alleging physical and medical neglect by the respondent as to Shaun. Those allegations, however, were not substantiated. Nevertheless, the respondent continued to have involvement with the department following the 2007 allegations, including issues regarding substance abuse, unsanitary living conditions, inadequate supervision, unaddressed mental health issues, domestic violence, and the respondent's exposure of

---

[3] The attorney for the minor children filed a petition statement in this appeal adopting the position of the commissioner.

[4] The respondent failed to file a signed copy of the court's decision with this court. Nevertheless, she has provided a transcript of the trial, which includes the court's oral decision.

the children to a known sex offender. In July, 2011, the department received a referral from the Enfield police department concerning Shaun and his half sister Severina, who was born in 2010, after the respondent was charged with two counts of risk of injury to a child for leaving them unattended in her vehicle in the summer heat for approximately twenty minutes while she went into two supermarkets to return cans and bottles.[5] After its investigation, the department offered the respondent ongoing services. The court handling the criminal proceedings ordered the respondent to cooperate with the department. Although the respondent acknowledged to the department that she should not have left the children unattended in her vehicle in the summer heat, when asked by the department investigator why she had left the children in the vehicle, she responded: "You try carrying around a four year old and [an] eight month old." The department investigator reported that the respondent failed to grasp the seriousness of her actions or the risk in which she had placed her children.

After being evicted from their apartment, the respondent, the children and Severina's father, Patrick Z., on or about August 29, 2011, moved in with the maternal grandmother,[6] who had an extensive history with the department in connection with the respondent and the respondent's younger half brother, Corey. This history included nineteen referrals to the department that resulted in six substantiated allegations of physical and/ or emotional neglect. When the family moved into the maternal grandmother's home, the home contained two red-tailed boa constrictor snakes,[7] forty to fifty rats kept

---

[5] Koren Kermashek, a department social worker, who was assisting the family during November and December, 2011, testified that the day in question was "the hottest day of the summer."

[6] The maternal grandmother of Shaun and Severina is the mother of the respondent and the respondent's younger half brother, Corey.

[7] Kermashek testified that the respondent and Severina's father told her in November, 2011, that each of the snakes was approximately eight feet in length.

to feed the snakes,[8] four sugar gliders,[9] and several birds, dogs and cats. Shaun was permitted to have physical contact with newly born rats, which have no teeth, while being supervised by the maternal grandmother, but, the maternal grandmother testified that, although Shaun is very interested in the rats, he is "not allowed to play with rats because they—they bite." Severina, her father and the respondent slept in a bedroom where the snakes were kept in a tank, and Shaun slept in a bedroom where two tanks full of rats were kept. Prior to the ex parte orders of temporary custody, the respondent was aware that the department was concerned about the children living at the home of the maternal grandmother, and the respondent acknowledged that it was not a good idea.

On September 6, 2011, the respondent and Severina's father were arrested after a domestic violence incident.[10] Severina's father testified that the incident resulted from his being overwhelmed, the respondent's lack of help with the children and her desire to go out with a friend. During the argument, the respondent hit Severina's father and grabbed his throat, and, in response, he grabbed her throat, ultimately leading to their arrests. Severina was present in the home during this altercation. Severina's father also testified that after the police were called, he learned that the friend whom the respondent had planned on seeing was her boyfriend, of whose existence he had been unaware. There also was evidence introduced concerning a website on

---

[8] The maternal grandmother testified that each snake consumes as many as eight rats per feeding.

[9] According to Random House Unabridged Dictionary (2d Ed. 1993) p. 1901, a sugar glider is "a gliding possum . . . ."

[10] Severina's father testified that in relation to the domestic violence incident, he was charged with one count of breach of the peace and the respondent was charged with two counts of breach of the peace, one for her altercation with Severina's father and one for her argument with the responding police officer.

which the respondent had been offering prostitution services. Koren Kermashek, a department social worker, stated that the respondent's website had been taken down during the department's investigation but that she later was informed by Shaun's father that it was back up. Furthermore, in October, 2011, the respondent tested positive for marijuana, and she admitted to the department that she engaged in excessive drinking on the weekends and smoked K3 on a nightly basis.[11]

On December 7, 2011, the commissioner filed petitions alleging that Shaun and Severina were neglected because each was being denied proper care and attention, physically, educationally, emotionally or morally, and each was being permitted to live under conditions, circumstances or associations injurious to his or her well-being. Additionally, the commissioner submitted an affidavit by Kermashek seeking out-of-home placement of Shaun and Severina, containing averments that the respondent had unresolved substance abuse and mental health issues that negatively impacted her ability to care for each child appropriately, that she was participating in illegal online activity and that she was not compliant with her substance abuse program. Kermashek also averred that the respondent was unable or

[11] Although not part of the appellate record, K3 is described as one of a number of products known as "synthetic marijuana"; these products contain "chemicals called cannabinoids that are made to mimic the action of 9-tetrahydrocannabinol (THC), the main psychoactive ingredient of marijuana. They are powerful drugs that may cause severe side effects. They may also be called 'plant food' or 'herbal incense.'" New York City Department of Health and Mental Hygiene, "Synthetic Marijuana (Cannabinoids), Frequently Asked Questions for Retailers", available at http://www.nyc.gov/html/doh/downloads/pdf/public/press12/synthetic-marijuana-faqs-for-retailers.pdf (last visited on July 13, 2012). "Using synthetic marijuana can cause increased heart rate, paranoid behavior, agitation, irritability, nausea and vomiting, confusion, drowsiness, headache, hypertension, electrolyte abnormalities, seizures and loss of consciousness. Severe side effects may include acute renal failure and significant negative effects to the cardiovascular and central nervous systems. Use of synthetic marijuana has also been linked to death." Id.

unwilling to provide a safe, stable and nurturing environment for Shaun and Severina and that she was unable or unwilling to provide a safe and sanitary living environment for each of them. Kermashek also submitted a report concerning the history of the department's contacts with the family and referring to the maternal grandmother's extensive history with the department. The commissioner alleged that the children were in immediate physical danger from their surroundings, that immediate removal from such surroundings was necessary to ensure their safety, that custody by the commissioner was necessary to safeguard Severina's welfare and that custody by his father was necessary to safeguard Shaun's welfare.

On December 7, 2011, the court issued an ex parte order granting temporary custody of Shaun to his father, finding that Shaun was in immediate physical danger from his surroundings and that, as a result of said conditions, Shaun's safety was endangered and immediate removal from his surroundings was necessary. Also on December 7, 2011, the court issued an ex parte order granting temporary custody of Severina to the commissioner, finding that she was in immediate physical danger from her surroundings, that it was necessary for her temporary care and custody to be vested in the commissioner and that, under the circumstances presented, reasonable efforts to prevent or eliminate the need for her removal were not possible.

On December 22 and 23, 2011, the court heard the parties concerning whether the ex parte orders of temporary custody should be sustained or vacated, and after the conclusion of the hearing the court rendered its decision sustaining the orders of temporary custody. The court found that the children had been subjected by the respondent and Severina's father to a "continuum of risks . . . combined with an appalling lack of judgment and understanding and appreciation for the risks

that these children have been in" and that, because their attitude was that the department's involvement was "basically BS," they did not cooperate with the department. Although the incident involving the children being left in the vehicle might have been enough for the court to issue a custody order, given that the children could have died in the summer heat, the court noted that the department decided to give the respondent and Severina's father the opportunity to demonstrate that removal was not necessary, but they were unsuccessful in demonstrating that.

The court also found that the respondent had "a horrible, traumatic history for which she need[ed] very serious services and intensive treatment in order to get her children back" but, despite an order from the court in the risk of injury case for her to cooperate with the department, she failed to cooperate. The court found that the respondent and Severina's father had a long history of being irresponsible, and the domestic violence incident between them demonstrated the degree of volatility and defensiveness that permeated the case and increased the risks for the children. The court found that the maternal grandmother had a horrific history concerning her treatment of her own children, and the decision of the respondent and Severina's father to move in with her and the snakes and rats, which were kept in rooms in which the children slept, was another example of excruciatingly poor judgment. The court also stated that Shaun had indicated that the maternal grandmother and her friend Dave had hit him on "the face and [on] the butt" and that Shaun further did not feel safe with the respondent, but that he did feel safe with his father.

I

The respondent challenges the court's ex parte orders of temporary custody issued on December 7, 2011,

which orders were sustained by the court after a contested hearing on December 22 and 23, 2011. Citing to *In re Juvenile Appeal (83-CD)*, 189 Conn. 276, 287, 455 A.2d 1313 (1983), the respondent argues that "summary assumption of temporary custody is authorized only when there is probable cause to believe that the child . . . is in *immediate* physical danger from his surroundings, *and* that *immediate* removal from such surroundings is *necessary* to ensure the child's safety . . . ." (Emphasis in original; internal quotation marks omitted.) She asserts that these limitations on the power of the state are necessary to protect the constitutional rights of both the parent and the child. She claims that in the present case, the state abused its power and the respondent was denied due process of law. Her focus, however, when she refers to the state, is primarily on the department, and not on the court. She states that there are significant constraints that the department disregarded, and "[b]ecause the department began drafting [its] petition in October [2011] and admits that there was no change in the imminent health and safety of the children between October and December 7, 2011, there was no discretion to be exercised and the [order of temporary custody] that was granted ex parte on December 7, 2011, should have been revoked as a matter of law." She states that she was entitled to, what she refers to as, a "pre-deprivation hearing" and argues that holding a hearing *after* her children were removed violated due process and fundamentally was unfair. She seeks de novo review of her claim.

The respondent acknowledges, however, that General Statutes § 46b-129 "satisfies the constitutional right to due process of law" and provides clear authority for the department to seek to act to protect children, but she does not refer to or discuss that portion of § 46b-129 (b), which authorizes the court, in its discretion, to grant a hearing *either* prior to or after issuance of

an order of temporary custody.[12] In support of her claim that she was denied a "pre-deprivation hearing," the respondent refers in her brief to this court to a portion of a recent opinion of our Supreme Court generally discussing procedural due process: "[F]or more than a century the central meaning of procedural due process has been clear: Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified. . . . It is equally fundamental that the right to notice and an opportunity to be heard must be granted at a meaningful time and in a meaningful manner." (Internal quotation marks omitted.) *In re DeLeon J.*, 290 Conn. 371, 378, 963 A.2d 53 (2009). Additionally, she refers to a portion of an opinion from this court when arguing: "The notice and hearing must be meaningful in both time and manner in a way that details the reasons for the proposed action [and provides] an effective opportunity to defend by confronting any adverse witnesses and by presenting his own arguments and evidence orally." (Internal quotation marks omitted.) *State* v. *Warren,* 100 Conn. App. 407, 425, 919 A.2d 465 (2007). Neither of these cited quotations, or any other part of the respondent's briefs,

---

[12] General Statutes § 46b-129 (b) provides in relevant part: "If it appears from the specific allegations of the petition and other verified affirmations of fact accompanying the petition and application, or subsequent thereto, that there is reasonable cause to believe that (1) the child . . . is in immediate physical danger from the child's . . . surroundings, and (2) that as a result of said conditions, the child's . . . safety is endangered and immediate removal from such surroundings is necessary to ensure the child's . . . safety, the court shall either (A) issue an order to the parents or other person having responsibility for the care of the child . . . to appear at such time as the court may designate to determine whether the court should vest the child's . . . temporary care and custody in a person related to the child . . . by blood or marriage or in some other person or suitable agency pending disposition of the petition, or (B) issue an order ex parte vesting the child's . . . temporary care and custody in a person related to the child . . . by blood or marriage or in some other person or suitable agency. A preliminary hearing on any ex parte custody order or order to appear issued by the court shall be held not later than ten days after the issuance of such order. . . ."

however, meaningfully discuss or analyze how § 46b-129 (b), facially or as applied by the court in connection with the granting of the ex parte custody orders and the conducting of the two day hearing beginning fifteen days thereafter, violated the respondent's procedural due process right to be heard at a meaningful time and in a meaningful manner.[13] She discusses § 46b-129, excluding, however, any discussion of the court's statutory discretion under § 46b-129 (b) (2) to determine whether to order and hold a hearing prior to determining whether to grant a temporary custody order. Also, the respondent does not claim that the court abused its statutory discretion in granting the ex parte order of temporary custody. Rather, she argues that § 46b-129 "limits the decision-maker and requires that all parents be afforded a pre-deprivation hearing in cases of abuse and neglect except in the most urgent of circumstances" and that the court's failure to do so in this case violated her rights to due process. She does not cite any decisions that support her argument that, to provide procedural due process to parents, a prior hearing *is required* by § 46b-129 "except in the most urgent of circumstances," and she concedes, moreover, that, if the standards set forth in § 46b-129 (b) are satisfied, she is not entitled to a preremoval hearing. It appears, although it is unclear, that she, essentially, is claiming that the court's exercise of its statutory discretion to grant an ex parte order of temporary custody under § 46b-129 (b) (2) (B), instead of a hearing under § 46b-129 (b) (2) (A), although not amounting to an abuse of discretion, violated her right to due process, but that the statute itself is not unconstitutional. The commissioner argues, inter alia, that this claim is briefed inadequately

[13] For example, the respondent does not claim that she was not provided with the reasons for the granting of the orders of temporary custody, nor does she claim that she was not provided with an effective opportunity to confront adverse witnesses and to present her own arguments and evidence.

because the respondent fails to set forth a sufficient due process analysis.[14] We agree.

"It is well settled that [appellate courts] are not required to review claims that are inadequately briefed. . . . We consistently have held that [a]nalysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . [F]or this court judiciously and efficiently to consider claims of error raised on appeal . . . the parties must clearly and fully set forth their arguments in their briefs. We do not reverse the judgment of a trial court on the basis of challenges to its rulings that have not been adequately briefed." (Internal quotation marks omitted.) *Keating* v. *Ferrandino*, 125 Conn. App. 601, 603, 10 A.3d 59 (2010); see also, e.g., *State* v. *Vakilzaden*, 272 Conn. 762, 768 n.11, 865 A.2d 1155 (2005) (declining to review defendant's state constitutional claim where no independent analysis under state constitution was presented). Because of the respondent's failure to analyze and to brief adequately her due process claim, we consider the claim to have been abandoned.

II

The respondent next claims that even if the December 7, 2011 removal of her children was lawful, the court

[14] The commissioner also argues that this claim has been rendered moot by the trial court's sustaining of the orders of temporary custody. Specifically, the commissioner argues: "The ex parte order was subsumed under the judgment sustaining the order of temporary custody. As such, as to the ex parte order, there is no practical relief this court can grant as that order is no longer in question." We disagree with this assertion. After the two day hearing, the court sustained the December 7, 2011 orders of temporary custody; see Black's Law Dictionary (9th Ed. 2009) (to sustain is "[t]o support or maintain . . . to uphold . . ."); it did not grant new orders of temporary custody effective December 23, 2011. Compare *In re Carl O.*, 10 Conn. App. 428, 434, 523 A.2d 1339 (orders of temporary custody were rendered moot when children were adjudicated to be neglected), cert. denied, 204 Conn. 802, 525 A.2d 964 (1987).

had a legal obligation to consider that a change in her circumstances had occurred after the granting of the ex parte orders and that removal was no longer necessary to protect the children from imminent risk of harm as of the December 22 and 23, 2011 hearing. The respondent asserts that pursuant to *In re Juvenile Appeal (83-CD)*, supra, 189 Conn. 291, the burden was on the state to prove that the reason for the ex parte orders still existed at the time of the hearing. She states that after the department removed her children, and before the contested hearing, she had moved into a family shelter to provide safe quarters for her children. She claims that the court refused to consider this change in her circumstances and that its failure to do so raises an issue of constitutional dimension. The commissioner responds that the record demonstrates that the court did consider the respondent's claim that she had moved to a shelter five days before the start of trial and that this claim is not of constitutional dimension. We agree with the commissioner and conclude that this nonconstitutional claim has no merit. The record fully supports the court's decision to sustain the order of temporary custody.

"Pursuant to . . . § 46b-129 (b), the court may issue an order ex parte vesting in some suitable agency or person the child's or youth's temporary care and custody if it appears, on the basis of the petition and supporting affidavits, that there is reasonable cause to believe that . . . the child . . . is in immediate physical danger from the child's . . . surroundings, and . . . that as a result of said conditions, the child's . . . safety is endangered and immediate removal from such surroundings is necessary to ensure the child's . . . safety . . . .

"At a subsequent hearing on an order of temporary custody, the proper standard of proof . . . is the normal civil standard of a fair preponderance of the evidence. . . . We note that [a]ppellate review of a trial

court's findings of fact is governed by the clearly errone-
ous standard of review. The trial court's findings are
binding upon this court unless they are clearly errone-
ous in light of the evidence and the pleadings in the
record as a whole. . . . We cannot retry the facts or
pass on the credibility of the witnesses. . . . A finding
of fact is clearly erroneous when there is no evidence
in the record to support it . . . or when although there
is evidence to support it, the reviewing court on the
entire evidence is left with the definite and firm convic-
tion that a mistake has been committed." (Citation omit-
ted; internal quotation marks omitted.) *In re Kelsey M.*,
120 Conn. App. 537, 542–43, 992 A.2d 372 (2010).

In the present case, the respondent alleges that the
court improperly failed to consider her change in cir-
cumstances at the time of the hearing.[15] Without any
analysis as to how this allegation amounts to a due
process violation, she asserts that the claim is of consti-
tutional magnitude. We disagree and conclude that the
weight to be given evidence is to be determined by the
trier of fact, in this case, the judge; *In re Kamari C-
L.*, 122 Conn. App. 815, 826 n.12, 2 A.3d 13 ("[w]eighing
of evidence is, of course, the function of the trier of
facts and not that of a court of review"), cert. denied,
298 Conn. 927, 5 A.3d 487 (2010); and that the court's
decision fully is supported by the record.

In the present case, the court found by a preponder-
ance of the evidence that the commissioner had met
her burden of proof with respect to the continuation
of the orders of temporary custody. The court found
that the children had been subjected to risky behavior

---

[15] The respondent's assertion that she moved into a shelter before the
date of the hearing, although such move occurred after the date of the ex
parte orders, was admitted into evidence without objection by the commis-
sioner or any other party. There is no claim on appeal that this evidence
was improper. Accordingly, we do not consider whether the court properly
considered it.

by the respondent, including being left unattended in the respondent's vehicle in the summer heat for twenty minutes where they could have died, and by Severina's father. The court further found that the respondent and Severina's father possessed an appalling lack of judgment, understanding and appreciation of the risky situations in which the children had been placed. It also found that the respondent and Severina's father did not accept the involvement of the department, and refused to cooperate with the department for the provision of services, even after the criminal court's specific order to the respondent that she cooperate. The court noted the respondent's horrible traumatic history for which she needed serious services and intensive treatment before her children could be returned to her. The court also reviewed the domestic violence incident that had occurred when Severina was present in the home, which, according to the court, demonstrated the volatility and defensiveness of the respondent and Severina's father, thus increasing the risks to the children. The court found that the respondent and Severina's father had a long history of being irresponsible, highlighted by the recent events beginning with the children being left unattended in the respondent's vehicle. The court also noted the respondent's history of prostitution. In this context, the court did not find credible the respondent's claim that she was going to stay in a shelter, where she had been for approximately five days, which, in any event, was not the sole issue in determining whether the orders of temporary custody should be sustained, and that she was going to make other changes or do other things, because the court did not find it credible that her attitude toward the department or its services actually had changed. In issuing its oral decision, the court specifically stated: "If you have any chance of getting your children back that attitude absolutely has to change. It just has to. And I guarantee you

if the attitude does not change and that you don't take seriously the services that are going to be recommended to you and frankly, probably ordered by this court, your chances of getting your children back are greatly diminished."[16] On the basis of these findings, which are supported by the record, we conclude that the respondent has not demonstrated any clear error by the trial court.

## III

The respondent next claims that the *department* violated her constitutional rights to privacy and to freedom of association when, in the hearing, it used evidence of her own childhood history of being abused to justify intrusion into her personal relationships with her children and her mother. She claims that during the process of protecting her during her childhood, the department acquired substantial information concerning the intimate details of her life, which it is using against her now that she is an adult. She seeks review of this claim pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). The commissioner argues that the respondent's claim does not involve the actions of the court, but, rather, that she is claiming that the *department* violated her rights. Accordingly, the commissioner argues, this claim is not reviewable. Additionally, the commissioner argues that the respondent never objected to the admission of this evidence[17] and that she

---

[16] By way of example, although the court had ordered specific steps to which the respondent agreed in writing, and she had agreed therein to drug testing, she declined to attend a hair test scheduled on December 21, 2011, one day before the contested hearing began. Additionally, although she was ordered to sign releases allowing the department to communicate with service providers, she refused to execute completely a release allowing the department to communicate with the shelter, and, thus, the department could not confirm her allegation that she resided there.

[17] The record reveals, however, that the respondent, through her trial attorney who is also her attorney on appeal, objected to the admission of one of the protocol reports on the basis that the beginning pages thereof related to the respondent's childhood history, including health and behav-

examined both the maternal grandmother and herself about her childhood. The commissioner asserts that the respondent's failure to object, combined with the examinations she conducted, constitute a waiver of her evidentiary claims. The commissioner also argues, in the alternative, that the respondent has not briefed her claim adequately. We agree that this claim is not reviewable.

In her reply brief, the respondent argues that she has not waived her right to review and that she properly has briefed and analyzed her request for *Golding* review. She further asserts that "[t]he [commissioner's] characterization of this claim as a matter of unpreserved evidentiary error is seriously misguided. This is a direct legal challenge to the actions of the [department], which took information gathered in the name of protecting [the respondent] as a child and later used and continues to use that information against her as an adult, in violation of her rights to privacy and to freedom of association."

A thorough review of the respondent's brief and her reply brief leads us to the conclusion that the respondent does not appreciate the material difference between the separate responsibilities of the commissioner and the court or what properly can be raised in an appeal. In this case, the commissioner offered evidence of the history of the respondent and the maternal grandmother, but it was the court, and not the commissioner, that allowed the evidence to be admitted in the hearing.[18] Therefore, the respondent's claim on appeal must be based on the admission of that evidence

---

ioral concerns. Another objection, made by Severina's father, was that the information was too remote.

[18] Likewise, it was the court that granted the ex parte orders pursuant to which the department removed the children from the respondent and Severina's father. The department did not act "coercively" on its own, as it could have, for example, pursuant to General Statutes § 17a-101g (e) and (f).

by the court rather than on any allegedly unconstitutional action by the department or the commissioner. The respondent, however, has not appealed the court's evidentiary rulings as an abuse of its discretion, nor has she claimed that the court's rulings regarding this evidence are unconstitutional.[19]

---

[19] We also note that the respondent voluntarily testified at the hearing, and prior to that testimony, her attorney said to her: "So we're going to start during your childhood and work forward, okay?" The respondent then voluntarily answered questions about her childhood, including her residential placements. She also called the maternal grandmother as a witness and elicited testimony from her about the respondent's childhood, including the following:

"Q. When [the respondent] was a child, did you have a difficult time caring for her?

"A. Yes. I did. She was a very difficult child to—to manage. She had a lot of behavior issues . . . [including] at nine years old, [believing that] it was perfectly okay to just not ask permission and just pack up her bag and sneak out the door and go spend the night at her friend's house . . . .

"Q. And, during the respondent's later childhood and adolescence, was she placed in a variety of treatment facilities and residential placements?

"A. Yes."

During cross-examination, the maternal grandmother testified, without objection, as follows:

"A. I asked . . . for [the respondent] to be removed from my home . . . . I had . . . responsibilities to my smaller child, at the time, and [she] was showing aggressive behavior. And I also had a probation obligation, which included a suspended sentence which had me very concerned for my own personal freedom . . . [a]nd ability to care for my other child in the process."

Also during cross-examination, the maternal grandmother testified without objection that the respondent was in foster care for less than a month and thereafter was placed by the department in residential facilities from age ten until she signed herself out at age sixteen. Additionally, the respondent elicited the following from the maternal grandmother concerning Corey:

"Q. Where is Corey living right now?

"A. He stays with his grandparents. . . .

"Q. How long has Corey lived away from your home?

"A. Five years. . . .

"Q. Why did he leave your home?

"A. Because I was in the same situation that I was in with my daughter, that the northwest corner of Connecticut only has very limited resources for children with behavioral issues and it was imperative to my son's outcome to get the help that he needed because the resources just are not available . . . .

Furthermore, even if we were to read her claim as alleging that the court somehow violated her constitutional rights by allowing this evidence, the respondent's questioning of witnesses and her own testimony, and the waiver implications arising therefrom, negate any of her alleged constitutional claims based on rights to privacy and to freedom of association that might be subject to *Golding* analysis. Additionally, we note that the respondent has not claimed that any provisions of § 46b-129 (b) facially or as applied by the trial court violated her alleged fundamental constitutional rights to privacy and to freedom of association, and we conclude that the respondent has not proven that the requirements of § 46b-129 (b) were not considered and applied properly by the court in the hearing to determine whether to admit evidence of the personal history of the respondent, her half brother and the maternal grandmother and to sustain the temporary custody orders in this case.

The judgment is affirmed.

In this opinion the other judges concurred.

---

"Q. Where does your son attend school now?

"A. My son goes to . . . and he—he, actually, just got out of [a special school program associated with a hospital] . . . . [H]e does go to an after school program for anger management issues . . . .

"Q. If your son needed a place to live tomorrow, would you open your door to him?

"A. Of course, I would. . . . He's at my house every weekend."

Finally, during her examination of Severina's father, the respondent asked if he was familiar with the respondent's childhood history, the maternal grandmother's history as her parent, and the family history.